No. 33,658

The Fidelity and Deposit Company of Maryland, *Appellee*, v. The Atchison, Topeka & Santa Fe Railway Company, *Appellant*.

(75 P. 2d 283)

Opinion filed January 29, 1938.

*Bruce Hurd, C. J. Putt, Robert M. Clark,* all of Topeka, and *W. E. Stanley,* of Wichita, for the appellant.

*Glenn Porter, Getto McDonald, Dwight S. Wallace* and *William Tinker,* all of Wichita, for the appellee.

The opinion of the court was delivered by

Harvey, J.: In this case defendant appealed from an order of the court overruling its demurrer to plaintiff's petition, in which, briefly stated, it was alleged:

That on January 25, 1933, one Marie Vestring was duly appointed by the probate court of Marion county as administratrix of the estate of Frank Weik; that she gave bond, conditioned as provided by statute (G. S. 1935, 22-313), in the sum of $13,000, with plaintiff as surety; that there came into her hands as such administratrix a sum in excess of $10,000, which she deposited in a bank at Wichita in her name as administratrix; that on June 14, 1933, she drew a check on this account, signed by her as administratrix, for $1,555.20, payable to the order of defendant's treasurer, and delivered the check to its livestock agent, a person authorized to act in that behalf; that defendant presented the check to the bank and received the money thereon; that the drawing of the check and payment thereof was a misappropriation, embezzlement, conversion and abstraction of the funds of the estate of Frank Weik not authorized by the probate court and not authorized or permitted by law; that the check was not given, nor the payment thereof made, for any debt, claim, demand, or liability of the estate or the administratrix

thereof. On information and belief it was alleged that a partnership composed of Henry Vestring and Louis Vestring, doing business under the name of Vestring Brothers, was engaged in the cattle business, and that the check was given in payment of a freight bill for the shipment of livestock owed by the partnership to defendant. It was alleged that defendant knew, or should have known from the nature of the transaction and the signature on the check, that the giving of the check and the payment thereof was a wrongful appropriation of the funds of the estate, and that the money so received by defendant was not that of its debtor. It was further alleged that on May 3, 1934, by orders of the probate court of Marion county, Marie Vestring was removed as administratrix of the estate of Frank Weik (G. S. 1935, 22-323), and John E. Wheeler was appointed administrator *de bonis non* of that estate; that the condition of the bond upon which plaintiff was surety, having been broken by the action of Marie Vestring, administratrix, the administrator *de bonis non* made demand upon this plaintiff for payment to him, on behalf of the estate, of all the funds so wrongfully applied, including the sum represented by the check above mentioned; that about May 9, 1935, plaintiff paid to such administrator *de bonis non* the sum of $10,000, which amount represented the wrongful appropriation of Marie Vestring, administratrix, and included the entire amount of the check to defendant, above mentioned; that thereupon plaintiff became subrogated to the rights of the administrator *de bonis non* and to all claims, demands, or choses in action arising by reason of the facts stated; that on or about May 9, 1935, the administrator *de bonis non,* with the permission and ratification of the probate court of Marion county, made, executed and delivered to plaintiff an assignment in writing wherein and whereby he assigned, transferred and set over to this plaintiff all the right, title and interest in the estate of Frank Weik, deceased, and the administrator thereof, in and to all claims, demands, or causes of action arising out of the matters above stated, and that by virtue of the subrogation, and by virtue of the assignment above mentioned, plaintiff is the owner of the cause of action herein asserted against defendant. The prayer was for judgment for plaintiff in the sum of $1,555.20 with interest at six percent since May 9, 1935, and for costs.

Appellant argues that the giving of the check to it by Marie Vestring, administratrix, did not constitute notice to defendant of

her wrongdoing. The point is not well taken. The check on its face indicated the money was to be paid out of an estate; the estate was not indebted to appellant. In *Bank v. Myers,* 65 Kan. 122, 69 Pac. 164, it was held:

"One who through the design or misdirection of another receives money which he knows belongs to a third person, cannot retain it for application on his own debt, due from the one who gave it to him."

Here the situation is still further removed. Appellant did not apply the check on a debt to it of Marie Vestring; she owed it nothing. The application was made upon the debt of Vestring Brothers to appellant.

In 65 C. J. 992 the rule is thus stated:

"A transferee of trust property is chargeable with constructive notice of the trust where instruments or papers, so connected with the transaction that he is bound to take notice of them, show or indicate upon their face that the property is of a trust character. Thus a transferee is put upon constructive notice where an instrument or paper forming part of the chain of title, . . . or other instrument by which the trustee purports to make the transfer, shows upon its face that the property is trust property."

To the same effect is the American Law Institute, Restatement, Trusts, section 297, and the notes and comments upon the section.

The check by which appellant was paid showed upon its face that the fund out of which it was payable was the property of an estate being administered in a probate court. Appellant cannot be heard to say otherwise. It, of necessity, knew it was receiving funds of an estate which owed it nothing. Other authorities to the same effect are: *Loan Co. v. Essex,* 66 Kan. 100, 106, 107, 71 Pac. 268; *Guernsey v. Davis,* 67 Kan. 378, 73 Pac. 101; *Hier v. Miller,* 68 Kan. 258, 75 Pac. 77; *Washbon v. Hixon,* 86 Kan. 406, 121 Pac. 518; 87 Kan. 310, 124 Pac. 366; *Bank v. Betts' Estate,* 103 Kan. 807, 176 Pac. 660.

See, also, *New Georgia Nat. Bank v. Lippmann,* 249 N. Y. 307, 164 N. E. 108.

It is argued on behalf of appellant that it had to collect its freight when payment was tendered, otherwise it would have violated federal statutes and regulations prohibiting preferences to shippers. This contention is beside the mark. It had a lien on the shipment for freight; it was under no compulsion to accept money of an estate which owed it nothing.

Appellant argues plaintiff cannot maintain this action upon the subrogation clause in its contract of surety. We see no reason to so

hold, but the question is not material, since plaintiff also predicates its action on an assignment, the validity of which is not assailed.

It is next argued the equities of appellant are greater than those of appellee. This contention does not seem forceful. Each of the parties is a financial institution operated for profit. We see no reason why each is not entitled to its rights under the law.

The judgment of the court below is affirmed.

ALLEN, J. (dissenting): From the record in this case it appears the parties entered into the following stipulation:

"Plaintiff states in open court that it does not contend that the defendant or the defendant's agent actually knew that Marie Vestring was wrongfully, criminally, or unlawfully embezzling, misappropriating, or unlawfully abstracting the funds of said checks from the estate of Frank Weik, deceased."

Our statute, G. S. 1935, 52-506, provides:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The stipulation admits the defendant had no actual knowledge of any infirmity in the paper. Did the defendant have such knowledge of the facts that the acceptance of the check amounted to bad faith? What is meant by "bad faith" as used in the statute? In *Gigoux v. Moore*, 105 Kan. 361, 184 Pac. 637, it was said:

"Here, as in the case of notice of infirmity in the instrument or defect in title of the holder, bad faith is bad faith in fact, bad faith derived by influence [inference] of fact, as distinguished from inference of law. Here, as in case of notice of infirmity or defect in title, failure to use ordinary diligence in following up suggestive facts, or facts arousing suspicion, is not sufficient. (*Bank v. Reid,* 86 Kan. 245, 120 Pac. 339.) The expression found in the old law of bills and notes, "usual course of business," is not found in the section of the negotiable-instruments law quoted. Actual bad faith is essential. Unless, therefore, the security transaction were not, in truth, what it purported to be, and the plaintiff were intentionally colluding in misappropriation of the corporate assets, or were resorting to some deceitful practice or device, or were otherwise acting from reprehensible motives, to achieve some unconscientious or unjustifiable result, he was not guilty of bad faith." (p. 366.)

A thing is done in good faith when it is in fact done honestly, whether it be done negligently or not. No substantial reason has been suggested why G. S. 1935, 52-506, does not apply to the facts in this case. (4 Williston on Contracts, Rev. Ed., § 1157.) Under that statute mere failure to inquire as to the power of the administratrix might be negligence, but such failure would not amount to

bad faith. To justify the holding of the court the stipulation must be ignored, the statute emasculated, and our many decisions defining bad faith must be overruled.

But if we ignore the N. I. L. statute and view the action as one in equity to charge the defendant as participating in the breach of a trust, the plight of the plaintiff is not bettered. We must then distinguish the instances where the transaction is prima facie wrongful, and cases like the one before us where every presumption is in favor of good faith and fair dealing.

In *Washbon v. Hixon,* 86 Kan. 406, 121 Pac. 518 (Id. 87 Kan. 310, 124 Pac. 366), the check was signed "Albert Sarbach, Grand Treas'r." The check was used to discharge a private obligation. The action was prima facie wrongful—the payee knew it was for the personal benefit of the fiduciary. Clearly the transferee should be charged with participation in the breach of trust. But the rule there applied can have no application to a situation where every presumption is in favor of good faith in the transaction.

Thus, Professor Scott, in an article entitled "Participation in a Breach of Trust," 34 Harvard Law Review, 454, 463, said:

"But suppose that the instrument is not used for the purpose of paying a private debt of the fiduciary. Is the endorsee or payee under an obligation to ascertain whether the endorser or drawer is committing a breach of his fiduciary obligation? To impose such an obligation seriously impairs the marketability of such instruments. It seems to deprive the endorsee or payee of the defense of purchase for value although he has no actual knowledge of the defect and does not act in bad faith."

In this connection the uniform fiduciaries act, now in force in many states, is important as showing the drift of the law, and the true distinctions that should be made in these commercial transactions.

"*Check Drawn by Fiduciary Payable to Third Person.*—If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is

liable to the principal if the fiduciary in fact commits a breach of his obliga-·
tion as fiduciary in drawing or delivering the instrument." (9 U. L. A. 151.)

In a note prepared by Professor Scott for the Commissioners on
Uniform Laws, covering the above sections, it was said:

"Sections 4-6 cover two situations requiring different rules:

"1. Where the instrument is not given in a transaction known by the taker
to be for the personal benefit of the fiduciary.

"Here the taker should not be bound to make inquiry. The presumption
should be that the transaction is proper and the presumption should be re-
butted only by proof of actual knowledge that it is improper, or proof of bad
faith. The taker should be liable not only where he has actual knowledge
that the fiduciary is acting improperly but also where he acts in bad faith, as,
for example, where he suspects that the fiduciary is acting improperly and de-
liberately refrains from investigating in order that he may avoid knowledge
that the fiduciary is acting improperly. The test, however, should not be the
objective test of negligence but the subjective test of bad faith." (4 Bogert
on Trusts, p. 2623; see, also, sections 903, 904 and 905.)

Our statute, G. S. 1935, 22-1008, provides:

"If any executor or administrator shall waste or unfaithfully administer
the estate, the court granting the letters may, if they think proper, on the ap-
plication of any surety in the administration bond, order such executor or ad-
ministrator to render an account, and to execute to such surety a bond of
indemnity with surety or sureties approved by the court; and upon neglect
or refusal to execute such bond of indemnity within the time ordered by the
court, it may remove him and revoke his letters and appoint another admin-
istrator in his place."

The plaintiff in this case is a compensated surety. For a consid-
eration the plaintiff agreed to answer for the unfaithful conduct of
its principal. The defalcation of the fiduciary has imposed a heavy
financial loss on someone. Who shall pay that loss? The plaintiff
prays the court to saddle the loss on this defendant—at the most, a
negligent payee. But this statute imposes a duty on the surety to
watch as well as pray. Where the administrator is squandering the
estate the surety may apply to the court. The court will upon a
proper showing compel an accounting; the execution of a bond of in-
demnity to the surety; or may revoke the letters of administration
and appoint a new administrator. This statute imposes a duty on
the surety to protect his own interests by keeping well informed as
to the manner in which the estate is being administered. This may
be done by requiring checks of the administrator to be countersigned
by the agent of the surety company, or by filing with the bank where
the trust account is kept any restrictions on the power of the ad-

ministrator with reference to the funds of the estate which it may deem prudent. By failure to use reasonable precautions it gave to the unfaithful administratrix the opportunity and the power to injure innocent third persons. It is not usual for courts to compel the innocent to make restitution to those whose fault or folly caused the loss.

Enforcement of the rule announced by the court would seriously embarrass the business community. It would be poor commercial policy for this court to require banks, railroads and other business concerns to investigate the purposes of all trust checks in order to protect beneficiaries from an occasional wrongdoing trustee. Each business day thousands of checks drawn by trustees, agents, executors, administrators, and other fiduciaries pass through business houses and banks. The usefulness of the checking system upon which modern business is based would be seriously crippled if the delay and vexation attendant on such inquiries were introduced. The fear of loss, and the threat of lawsuits, like the one now before us, would tend to stagnate the business of the community.

It is not contended that the defendant knew the transaction was for the personal benefit of the administratrix; it is expressly admitted that defendant had no actual knowledge of any improper conduct, and bad faith on the part of the defendant is out of the question. The result of the lawsuit, then, as I see it, is not only to inflict a grave injustice on this defendant, but to promulgate a rule seriously detrimental to the business of the state.

I think the demurrer should have been sustained.

SMITH, J., joins in this dissent.

HARVEY, J. (concurring specially): The idea that G. S. 1935, 52-506, is applicable to this case is new. Counsel for the parties made no contention of that kind, and it was not mentioned in the briefs or oral argument; neither was it suggested in our consultation. It first appeared in the dissenting opinion two days before the time for handing the opinion down, and about three weeks after it was written. By its terms the statute applies to an instrument that has been negotiated. I have never heard that term applied to the transaction between the maker and the payee. It is not so defined in our statute (G. S. 1935, 52-401). The case of *Gigoux v. Moore*, 105 Kan. 361, 184 Pac. 637, pertains to a note transferred and endorsed to the plaintiff by the payee for value and before maturity.

I .am not concerned about the plight of those who knowingly receive money from a trust fund which owes them nothing. So far as my information goes, the instances are relatively rare in which that is done. Those who do so are in no worse· position by this opinion than they were before it was written. No opinion should be written which confers upon them the right to do so.